Elaine A. Ryan (AZ Bar #012870)
Colleen M. Auer (AZ Bar#014637)
**AUER RYAN, P.C.**
20987 N. John Wayne Parkway, #B104-374
Maricopa, AZ 85139
520-705-7332
eryan@auer-ryan.com
cauer@auer-ryan.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Anthony Spano, Donald Banti, Marcia Banti, Ryan Mangum, and Tiffany Mangum, on behalf of themselves and all others similarly situated, | **Case No.:** |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **DEMAND FOR JURY TRIAL** |
| Yuma Regional Medical Center, | |
| Defendant. | |

Plaintiffs Anthony Spano, Donald Banti, Marcia Banti, Ryan Mangum, and Tiffany Mangum ("Plaintiffs") bring this Class Action Complaint on behalf of themselves, and all others similarly situated against Defendant Yuma Regional Medical Center ("Yuma Regional" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities, and allege as follows:

## NATURE OF THE ACTION

1.      On April 25, 2022, Defendant Yuma Regional Medical Center, a 406-bed, not-for-profit hospital established in 1964, identified a ransomware attack of its internal

systems. Cybercriminals had unrestricted access to Yuma Regional's files and systems from April 21, 2022 to April 25, 2022 (the "Data Breach").

2.     As a result, Yuma Regional lost control of highly-sensitive files belonging to 700,000 patients that contained personal health information ("PHI")[1], including names, Social Security numbers, health insurance information, and medical information relating to care received at Yuma Regional.

3.     Not only did Yuma Regional fail to properly protect its patients' PHI, Yuma Regional failed to timely notify its patients of the Data Breach, waiting over two months to send letters to impacted patients.

4.     When Yuma Regional finally announced the Data Breach, it deliberately underplayed the Breach's severity and obfuscated the nature of the Breach. Yuma Regional's Breach Notice sent to patients fails to explain how many people were impacted, how the breach happened, or why it took over two months to send a bare-bones notice to impacted patients.

5.     On information and belief, cybercriminals were able to breach Yuma Regional's systems because Yuma Regional did not maintain reasonable security safeguards or protocols to protect its patients' PHI, leaving it an unguarded target for theft

---

[1] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information.* A "covered entity" is further defined as, *inter alia*, a health care provider who transmits any health information in electronic form in connection with a transaction covered by HIPAA. *Id. Covered entity.* Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed June 21, 2022). Yuma Regional is clearly a "covered entity" and the data compromised in the Data Breach that this action arises out of is "protected health information" subject to HIPAA.

and misuse. In fact, Yuma Regional confirms as much in its Breach Notice: "To help prevent something like this from happening again, we strengthened the security of our systems and will continue enhancing our protocols to safeguard the information in our care."[2]

6.      Yuma Regional's failure to timely detect and notify breach victims violates Arizona law and has made its patients vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PHI.

7.      Yuma Regional is offering "free credit monitoring and identity theft protection services" for an unstated duration. Exh. A. This is insufficient protection for those impacted by the Data Breach as their PHI was taken by unknown cybercriminals and can be used at any time in the future. Yuma Regional's offering will not prevent the unauthorized use of its patients' PHI and will merely serve to (possibly and hopefully) notify them if and when their PHI is used.

8.      Yuma Regional knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PHI misuse.

9.      Yuma Regional's misconduct has injured the Plaintiffs and members of the proposed Class, including: (i) the lost or diminished value of their PHI; (ii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iii) lost opportunity costs to mitigate the Data Breach's consequences, including lost time; and (iv) emotional distress associated with the loss of control over their highly sensitive PHI.

10.      Plaintiffs and members of the proposed Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiffs and members

---

[2] A true and accurate copy of the Breach Notice is attached to this complaint as **Exhibit A**. *See* https://www.yumaregional.org/EmergeWebsite/media/Yuma-Documents/Yuma-Regional-Medical-Center-Notice.pdf (last accessed June 21, 2022).

of the proposed Class trusted Defendant with their PHI. But Defendant betrayed that trust. Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

11.    Plaintiffs and members of the proposed Class therefore bring this lawsuit seeking damages and relief for Defendant's actions.

## PARTIES

12.    Plaintiff Anthony Spano is a natural person and citizen of Arizona, residing in Yuma, Arizona. Mr. Spano received notice of the data breach from Defendant Yuma Regional Medical Center stating that his PHI was compromised by the Data Breach.

13.    Plaintiffs Donald Banti and Marcia Banti are natural persons and citizens of Arizona, residing in Yuma, Arizona. Mr. and Mrs. Banti each received notice of the data breach from Defendant Yuma Regional Medical Center stating that their PHI was compromised by the Data Breach.

14.    Plaintiffs Ryan Mangum and Tiffany Mangum are natural persons and citizens of Arizona, residing in Yuma, Arizona. Mr. and Mrs. Mangum each received notice of the data breach from Defendant Yuma Regional Medical Center stating that their PHI was compromised by the Data Breach.

15.    Defendant Yuma Regional is an Arizona corporation with its principal place of business at 2400 South Avenue A, Yuma, Arizona, in Yuma County, 85364.

## JURISDICTION AND VENUE

16.    This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant to establish minimal diversity.

17.    This Court has personal jurisdiction over Yuma Regional because Defendant is headquartered in Arizona and conducts substantial business in this District.

18.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant is headquartered in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.     Yuma Regional's Failure to Safeguard Patients' PHI

19.     Plaintiffs and members of the proposed Class are Yuma Regional's current and former patients.

20.     As a prerequisite of receiving treatment, Yuma Regional requires its patients to provide their PHI.

21.     On information and belief, Yuma Regional maintains records of its patients' information such as its patients' full names, Social Security Numbers, financial account information, credit-card information, dates of birth, prescription information, diagnosis information, treatment information, treatment providers, health insurance information, medical information, and Medicare/Medicaid ID numbers, in the ordinary course of business. These records are stored on Yuma Regional's computer systems.

22.     When Yuma Regional collects this sensitive information, it promises to use reasonable measures to safeguard the PHI from theft and misuse.

23.     In fact, Yuma Regional informs its patients that it collects, maintains and safeguards their PHI (the "Privacy Policy).[3]

24.     The Privacy Policy warrants that Yuma Regional is "committed to protecting the confidentiality of [its patients'] medical information" and acknowledges its legal requirements to protect and responsibly disclose PHI in certain enumerated situations to authorized individuals. Yuma Regional also admits its duty to notify its patients in the event that it discovers a breach of unsecured PHI. Exh. B.

---

[3] A true and correct copy of the Notice of Privacy Policy is attached hereto as **Exhibit B.** *See* https://www.yumaregional.org/About-Us/Notice-of-Privacy-Practices (last accessed June 21, 2022).

25.     Yuma Regional also grants its patients the right to "expect that treatment records are confidential unless you have given permission to release information or reporting is required or permitted by law."[4]

26.     Yuma Regional represented to its patients that their PHI would be secure. Plaintiffs and members of the proposed Class relied on such representations when they agreed to provide their PHI to Yuma Regional.

27.     Despite its alleged commitments to securing sensitive patient data, Yuma Regional does not follow industry standard practices in securing patients' PHI.

28.     In April 2022, hackers bypassed Yuma Regional's security safeguards and infiltrated its systems, giving them unfettered access to patients' PHI.

29.     The unauthorized individuals had access to patients' PHI from April 21, 2022, to April 25, 2022, and removed files from Yuma Regional's systems. Exh. A.

30.     In response to the Data Breach, Yuma Regional contends that it "strengthened the security of [its] systems and will continue enhancing [its] protocols to safeguard the information in [its] care." Exh. A. These additional security measures should have been in place *before* the Data Breach.

31.     Yuma Regional's Breach Notice letter, as well as its website notice, both omit the size and scope of the breach. Yuma Regional has demonstrated a pattern of providing inadequate notices and disclosures about the Data Breach.

32.     On information and belief, the Data Breach has impacted at least 700,000 former and current Yuma Regional patients.

33.     On information and belief, Yuma Regional does not adequately train its employees on cybersecurity policies, enforce those policies, or maintain reasonable security practices and systems.

---

[4] A true and correct copy of the Patient Rights and Responsibilities is attached hereto as **Exhibit C**. *See* https://www.yumaregional.org/For-Patients/Your-Hospital-Stay/Patient-Rights-and-Responsibilities (last accessed June 21, 2022).

34.     Yuma Regional's negligent conduct caused the Data Breach. Yuma Regional violated its obligation to implement best practices and comply with industry standards concerning computer system security. Yuma Regional failed to comply with security standards and allowed its patients' PHI to be accessed and stolen by failing to implement security measures that could have prevented, mitigated, or timely detected the Data Breach.

35.     On information and belief, Yuma Regional notified victims of the Data Breach that their PHI was accessed in the breach via notice letters resembling the Breach Notice attached hereto as Exhibit A.

36.     Though Yuma Regional is offering free credit monitoring and identity theft protection services, breach victims do not know for how long these services will be provided. Exh. A.

37.     This is significant because, once PHI is taken by unauthorized individuals, victims' PHI can end up anywhere, be bought by anyone, and be used at any time in the future.

38.     Despite the lifelong harm that the Data Breach poses to Yuma Regional's former and current patients, Yuma Regional's offering of these monitoring services do not adequately address the harm its patients have suffered and will continue to suffer for many years to come.

**B.     Plaintiffs' Experiences**

39.     Plaintiff Anthony Spano is a current Yuma Regional patient.

40.     As a condition of receiving Yuma Regional's medical services, Yuma Regional required Mr. Spano to provide his PHI to Yuma Regional.

41.     Mr. Spano believed, as part of the payments to Yuma Regional for medical treatment and services, that those payments included amounts for data security. Had Mr. Spano known that Yuma Regional did not utilize reasonable data security measures, he would either have not transacted with Yuma Regional or would have paid less for those treatments and services.

42.     On June 17, 2022, Mr. Spano received a Breach Notice letter in the mail.

43.     Mr. Spano has spent on average 6 hours a day dealing with the ramifications of this data breach. He has experienced fraudulent transactions on two of his credit cards. And it is likely he will have to spend considerable time and effort over the coming years continuing to monitor his accounts to protect himself from further identity theft. Mr. Spano's personal financial security has been jeopardized and there is uncertainty over what medical information was revealed in the Data Breach.

44.     Had Mr. Spano known that Yuma Regional does not adequately protect PHI, he would either have not transacted with Yuma Regional or paid less for the services he received. Furthermore, Mr. Spano's sensitive PHI remains in Yuma Regional's possession without adequate protection against known threats, exposing Mr. Spano to the prospect of additional harm in the event Yuma Regional suffers another data breach.

45.     Plaintiffs Tiffany and Ryan Mangum are current Yuma Regional patients.

46.     As a condition of receiving Yuma Regional's medical services, Yuma Regional required Mr. and Mrs. Mangum to provide their PHI to Yuma Regional.

47.     Mr. and Mrs. Mangum believed, as part of the payments to Yuma Regional for medical treatment and services, that those payments included amounts for data security. Had Mr. and Mrs. Mangum known that Yuma Regional did not utilize reasonable data security measures, they would either have not transacted with Yuma Regional or would have paid less for those treatments and services.

48.     On or around June 17, 2022, Mr. and Mrs. Mangum each received a Breach Notice letter in the mail.

49.     Mr. and Mrs. Mangum will have to spend considerable time and effort over the coming years monitoring their accounts to protect themselves from identity theft. Mr. and Mrs. Mangum's personal financial security has been jeopardized and there is uncertainty over what medical information was revealed in the Data Breach.

50.     Had Mr. and Mrs. Mangum known that Yuma Regional does not adequately protect PHI, they would not have transacted with Yuma Regional or would have paid less for the services they received. Furthermore, Mr. and Mrs. Mangum's sensitive PHI remains in Yuma Regional's possession without adequate protection against known threats, exposing Mr. and Mrs. Mangum to the prospect of additional harm in the event Yuma Regional suffers another data breach.

51.     Plaintiffs Donald and Marcia Banti are current Yuma Regional patients.

52.     As a condition of receiving Yuma Regional's medical services, Yuma Regional required Mr. and Mrs. Banti to provide their PHI to Yuma Regional.

53.     Mr. and Mrs. Banti believed, as part of the payments to Yuma Regional for medical treatment and services, that those payments included amounts for data security. Had Mr. and Mrs. Banti known that Yuma Regional did not utilize reasonable data security measures, they would either have not transacted with Yuma Regional or would have paid less for those treatments and services.

54.     On June 14, 2022, Mr. and Mrs. Banti each received a Breach Notice letter in the mail.

55.     Mr. and Mrs. Banti have already spent, and will continue to have to spend, considerable time and effort over the coming years monitoring their accounts to protect themselves from identity theft. Mr. and Mrs. Banti's personal financial security has been jeopardized and there is uncertainty over what medical information was revealed in the Data Breach.

56.     Had Mr. and Mrs. Banti known that Yuma Regional does not adequately protect PHI, they would either not have transacted with Yuma Regional or would have paid less for the services they received. Furthermore, Mr. and Mrs. Banti's sensitive PHI remains in Yuma Regional's possession without adequate protection against known threats, exposing Mr. and Mrs. Banti to the prospect of additional harm in the event Yuma Regional suffers another data breach.

**C.     Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft**

57.     Plaintiffs and members of the proposed Class have suffered injury from the misuse of their PHI that can be directly traced to Defendant.

58.     The ramifications of Defendant's failure to keep Plaintiffs' and the Class's PHI secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

59.     According to experts, one out of four data breach notification recipients become a victim of identity fraud.[5]

60.     As a result of Defendant's failures to prevent—and to timely detect—the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

    a.   The loss of the opportunity to control how their PHI is used;

    b.   The diminution in value of their PHI;

    c.   The compromise and continuing publication of their PHI;

    d.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

    e.   Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent

---

[5] *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims*, ThreatPost.com (Feb. 21, 2013), https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/ (last visited June 21, 2022).

researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.   Delay in receipt of tax refund monies;

g.   Unauthorized use of stolen PHI; and

h.   The continued risk to their PHI, which remains in the possession of Yuma Regional and is subject to further breaches so long as Yuma Regional fails to undertake the appropriate measures to protect the PHI in their possession.

61.    Stolen PHI is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PHI can be worth up to $1,000.00 depending on the type of information obtained.[6]

62.    The value of Plaintiffs' and the proposed Class's PHI on the black market is considerable. Stolen PHI trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

63.    It can take victims years to spot identity or PHI theft, giving criminals plenty of time to milk that information for cash.

64.    One such example of criminals using PHI for profit is the development of "Fullz" packages.[7]

---

[6] *See* Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/  (last visited June 21, 2022).

[7] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From*

65.     Cyber-criminals can cross-reference two sources of PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

66.     The development of "Fullz" packages means that stolen PHI from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and other members of the proposed Class's stolen PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

67.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

68.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant did not rapidly report to Plaintiffs and the Class that their PHI had been stolen.

---

*Texas Life Insurance Firm*, KREBS ON SECURITY, (Sep. 18, 2014), *available at* https://krebsonsecurity.com/tag/fullz/, (last visited June 21, 2022).

69.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

70.     In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

71.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PHI. To protect themselves, Plaintiffs and the Class will need to be remain vigilant against unauthorized data use for years or even decades to come.

72.     The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In a FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[8]

73.     The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.[9] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment

---

[8] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited June 21, 2022).

[9] *Start With Security, A Guide for Business*, FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited June 21, 2022).

card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[10]

74.     According to the FTC, unauthorized PHI disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[11] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

75.     To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ¶ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ¶ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and

---

[10] *Id.*

[11] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last accessed June 21, 2022).

prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations. Yuma Regional thus knew or should have known that its data security protocols were inadequate and were likely to result in the unauthorized access to and/or theft of PHI.

76.     The healthcare industry is a prime target for data breaches.

77.     Over the past several years, data breaches have become alarmingly commonplace. In 2016, the number of data breaches in the U.S. exceeded 1,000, a 40% increase from 2015.[12] The next year, that number increased by nearly 45%.[13] The following year the healthcare sector was the second easiest "mark" among all major sectors and categorically had the most widespread exposure per data breach.[14]

78.     Data breaches within the healthcare industry continued to increase rapidly. According to the 2019 Healthcare Information and Management Systems Society Cybersecurity Survey, 68% of participating vendors reported having a significant security incident within the last 12 months, with a majority of those being caused by "bad actors."[15]

---

[12] *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, IDENTITY THEFT RESOURCE CENTER ("ITRC") (Jan. 19, 2017), https://bit.ly/30Gew91 [hereinafter "*Data Breaches Increase 40 Percent in 2016*"] (last accessed June 21, 2022).

[13] *Data Breaches Up Nearly 45 Percent According to Annual Review by Identity Theft Resource Center® and CyberScout®*, ITRC (Jan. 22, 2018), https://bit.ly/3jdGcYR [hereinafter "*Data Breaches Up Nearly 45 Percent*"] (last accessed June 21, 2022).

[14] *2018 End-of-Year Data Breach Report*, ITRC (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf. (last accessed June 21, 2022).

[15] *2019 HIMSS Cybersecurity Survey*, HEALTHCARE INFORMATION AND MANAGEMENT SYSTEMS SOCIETY, INC. (Feb. 8, 2019), https://bit.ly/3LJqUr6 (last accessed June 21, 2022).

79.     The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[16] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[17] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[18]

80.     The healthcare industry has "emerged as a primary target because [it sits] on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, ha[s] so much monetizable information stored in their data centers."[19]

81.     Charged with handling highly sensitive Personal Information including healthcare information, financial information, and insurance information, Defendant knew or should have known the importance of safeguarding the Personal Information that was entrusted to it. Defendant also knew or should have known of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be

---

[16] *2018 End-of-Year Data Breach Report*, *supra* FN14.

[17] Elinor Mills, *Study: Medical Identity Theft Is Costly for Victims*, CNET (Mar. 3, 2010), https://cnet.co/33uiV0v (last accessed June 21, 2022).

[18] *Id.*

[19] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, INSIDE DIGITAL HEALTH (Apr. 4, 2019), https://bit.ly/3x6fz08 (last accessed June 21, 2022).

imposed on Defendant's patients as a result of a breach. Defendant nevertheless failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

82. Defendant disclosed the PHI of Plaintiffs and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PHI of Plaintiffs and members of the proposed Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PHI.

83. Defendant's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has exposed the PHI of Plaintiffs and potentially thousands of members of the proposed Class to unscrupulous operators, con artists and outright criminals.

84. Defendant's failure to properly notify Plaintiffs and members of the proposed Class of the Data Breach exacerbated Plaintiffs' and members of the proposed Class's injury by depriving them of the earliest ability to take appropriate measures to protect their PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

**D. Yuma Regional Failed to Adhere to HIPAA**

85. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[20]

---

[20] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

86.     HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI is properly maintained.[21]

87.     The Data Breach itself resulted from a combination of inadequacies showing Yuma Regional failed to comply with safeguards mandated by HIPAA. Yuma Regional's security failures include, but are not limited to:

    a.  Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

    b.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

    c.  Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

    d.  Failing to ensure compliance with HIPAA security standards by Yuma Regional's workforce in violation of 45 C.F.R. § 164.306(a)(4);

    e.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

    f.  Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

    g.  Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

---

[21] *See* 45 C.F.R. § 164.306 (Security standards and General rules); 45 C.F.R. § 164.308 (Administrative safeguards); 45 C.F.R. § 164.310 (Physical safeguards); 45 C.F.R. § 164.312 (Technical safeguards).

h. Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

### E. Yuma Regional Failed to Adhere to FTC Guidelines

88. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[22] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Yuma Regional, should employ to protect against the unlawful exposure of Personal Information.

89. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[23] The guidelines explain that businesses should:

    a. protect the personal customer information that they keep;

    b. properly dispose of personal information that is no longer needed;

    c. encrypt information stored on computer networks;

    d. understand their network's vulnerabilities; and

    e. implement policies to correct security problems.

90. The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

---

[22] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (June 2015), https://bit.ly/3uSoYWF (last accessed June 21, 2022).

[23] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://bit.ly/3u9mzre (last accessed June 21, 2022).

91.    The FTC recommends that companies not maintain PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[24]

92.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

93.    Yuma Regional's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PHI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

## CLASS ACTION ALLEGATIONS

94.    Plaintiffs bring this action on behalf of themselves, and all members of the proposed Class (the "Class") pursuant to Ariz. R. Civ. P. 23(b)(2) and (b)(3) as defined as:

> All Yuma Regional Medical Center patients whose PHI was accessed in the Data Breach.

95.    The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally

---

[24] *See Start with Security*, *supra* FN22.

adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

96.     The Class defined above is identifiable through Defendant's business records.

97.     Plaintiffs reserve the right to amend the class definition.

98.     This action is properly maintainable as a class action under Ariz. R. Civ. P. 23.

99.     **Numerosity**. Plaintiffs are representative of the proposed Class, consisting of thousands of members, far too many to join in a single action.

100.    **Commonality**. There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a.  Whether Defendant had a duty to use reasonable care to safeguard Plaintiffs' and members of the Class's PHI;

b.  Whether Defendant breached the duty to use reasonable care to safeguard Plaintiffs' and members of the Class's PHI;

c.  Whether Defendant breached its contractual promises to safeguard Plaintiffs' and members of the Class's PHI;

d.  Whether Defendant knew or should have known about the inadequacies of its data security policies and system and the dangers associated with storing sensitive PHI;

e.  Whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiffs' and members of the Class's PHI from unauthorized release and disclosure;

f.  Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer systems to safeguard and protect Plaintiffs' and members of the Class's PHI from unauthorized release and disclosure;

g.  Whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

h.  Whether Defendant's delay in informing Plaintiffs and members of the Class of the Data Breach was unreasonable;

i.  Whether Defendant's method of informing Plaintiffs and other members of the Class of the Data Breach was unreasonable;

j.  Whether Defendant's conduct was likely to deceive the public;

k.  Whether Defendant is liable for negligence or gross negligence;

l.  Whether Defendant's conduct, practices, statements, and representations about the Data Breach of the PHI violated applicable state laws;

m.  Whether Plaintiffs and members of the Class were injured as a proximate cause or result of the Data Breach;

n.  Whether Plaintiffs and members of the Class were damaged as a proximate cause or result of Defendant's breach of its contract with Plaintiffs and members of the Class;

o.  Whether Defendant's practices and representations related to the Data Breach breached implied warranties;

p.  What the proper measure of damages is; and

q.  Whether Plaintiffs and members of the Class are entitled to restitutionary, injunctive, declaratory, or other relief.

101.  **Typicality**. Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs, and the members of the Class sustained damages arising out of Defendant's Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiffs and members of the Class sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

102.  **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class.

Plaintiffs have no interests that conflict with, or are antagonistic to those of, the Class, and Defendant has no defenses unique to Plaintiffs.

103.   **Superiority of Class Action**. A class action is also a fair and efficient method of adjudicating the controversy because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

104.   A class action is therefore superior to individual litigation because:

    a.   The amount of damages available to an individual plaintiff is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedural device;

    b.   Individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system; and

    c.   The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

105.   The litigation of the claims brought herein is manageable. Yuma Regional's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable

identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

106.   Adequate notice can be given to Class members directly using information maintained in Yuma Regional's records.

107.   **Predominance**. Pursuant to Rule 23(b)(3), the issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include but are not limited to the questions identified above.

108.   This proposed class action does not present any unique management difficulties.

109.   **Injunctive and Declaratory Relief**.  Further, Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

110.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 93.

111.   Plaintiffs and members of the Class entrusted their PHI to Defendant. Defendant owed to Plaintiffs and other members of the Class a duty to exercise reasonable care in handling and using the PHI in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

112.   Defendant owed a duty of care to Plaintiffs and members of the Class because it was foreseeable that Defendant's failure to adequately safeguard their PHI in accordance

with state-of-the-art industry standards concerning data security would result in the compromise of that PHI—just like the Data Breach that ultimately came to pass. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and members of the Class's PHI by disclosing and providing access to this information to third parties and by failing to properly supervise both the manner in which the PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

113.   Defendant owed Plaintiffs and members of the Class a duty to notify them within a reasonable time frame of any breach to the security of their PHI. Defendant also owed a duty to timely and accurately disclose to Plaintiffs and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary in order for Plaintiffs and members of the Class to take appropriate measures to protect their PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the harm caused by the Data Breach.

114.   Defendant owed these duties to Plaintiffs and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security protocols. Defendant actively sought and obtained Plaintiffs' and members of the Class's personal information and PHI for medical treatment services. Plaintiffs and members of the Class were required to provide their personal information and PHI to Defendant in order to receive medical treatment and services, and Defendant retained that information.

115.   The risk that unauthorized persons would attempt to gain access to the PHI and misuse it was foreseeable. Given that Defendant holds vast amounts of PHI, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PHI.

116.    PHI is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PHI of Plaintiffs and members of the Class and the importance of exercising reasonable care in handling it.

117.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PHI of Plaintiffs and members of the Class which actually and proximately caused the Data Breach and Plaintiffs' and members of the Class's injury. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and members of the Class's injuries-in-fact. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and members of the Class have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

118.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs' and members of the Class's actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PHI by criminals, improper disclosure of their PHI, lost value of their PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

**SECOND CAUSE OF ACTION**
**Negligence Per Se**
**(On Behalf of Plaintiffs and the Class)**

119.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 93.

120.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and members of the Class's PHI.

121.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect customers or, in this case, patients' PHI. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs' and the members of the Class's sensitive PII.

122.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and the Class's PHI and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PHI Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to its patients in the event of a breach, which ultimately came to pass.

123.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

124. Defendant had a duty to Plaintiffs and the members of the Class to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and the Class's PII.

125. Defendant breached its respective duties to Plaintiffs and members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and members of the Class's PII.

126. Defendant's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

127. Pursuant to HIPAA (42 U.S.C. § 1302d, *et seq*.), Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class members' PHI.

128. Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 C.F.R. § 164.304 definition of encryption).

129. Plaintiffs and Class members are within the class of persons that the HIPAA was intended to protect.

130. The harm that occurred as a result of the Data Breach is the type of harm that HIPAA was intended to guard against. The Federal Health and Human Services' Office for Civil Rights ("OCR") has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures relating to protected health information, caused the same harm as that suffered by Plaintiffs and the Class members.

131. Defendant breached its duties to Plaintiffs and the Class under HIPAA, by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class members' PHI.

132.   Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

133.   But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and members of the Class, Plaintiffs and members of the Class would not have been injured.

134.   The injury and harm suffered by Plaintiffs and members of the Class were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PHI.

135.   Had Plaintiffs and members of the Class known that Defendant did not adequately protect their PHI, Plaintiffs and members of the Class would not have entrusted Defendant with their PHI.

136.   As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and members of the Class have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of PII; unreimbursed losses relating to fraudulent charges; losses relating to exceeding credit and debit card limits and balances; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen personal information, entitling them to damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**Breach of an Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

137.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 93.

138.   Defendant offered to provide goods and services to Plaintiffs and members of the Class in exchange for payment.

139.   Defendant also required Plaintiffs and the members of the Class to provide Defendant with their PHI in order to receive goods and services.

140.   In turn, and through the Privacy Policy, Defendant agreed it would not disclose the PHI it collects from patients to unauthorized persons. Defendant also promised to maintain safeguards to protect its patients' PHI.

141.   Plaintiffs and the members of the Class accepted Defendant's offer by providing PHI to Defendant in exchange for receiving Defendant's goods and services and then by paying for and receiving the same.

142.   Implicit in the parties' agreement was that Defendant would provide Plaintiffs and members of the Class with prompt and adequate notice of any and all unauthorized access and/or theft of their PHI.

143.   Plaintiffs and the members of the Class would not have entrusted their PHI to Defendant in the absence of such agreement with Defendant.

144.   Defendant materially breached the contract(s) it had entered with Plaintiffs and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusion into its systems that compromised such information. Defendant further breached the implied contracts with Plaintiffs and members of the Class by:

   a. Failing to properly safeguard and protect Plaintiffs' and members of the Class's PHI;

   b. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

   c. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1).

145.    The damages sustained by Plaintiffs and members of the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

146.    Plaintiffs and members of the Class have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendant.

147.    The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

148.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

149.    Defendant had an implied duty to reasonably safeguard and protect the PHI of Plaintiffs and Class members from unauthorized disclosure or uses.

150.    Additionally, Defendant implicitly promised to retain this PHI only under conditions that kept such information secure and confidential.

151.    Plaintiffs and Class members fully performed their obligations under the implied contract with Defendant. Defendant did not. Plaintiffs and Class members would not have provided their confidential PHI to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their PHI for uses other than medical treatment, billing, and benefits from Defendant.

152.    Defendant failed to advise Plaintiffs and members of the Class of the Data Breach promptly and sufficiently.

153.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

154.    Plaintiffs and members of the Class have sustained damages as a result of Defendant's breaches of its agreement, including breaches thereof through violations of the covenant of good faith and fair dealing.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

155.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 93.

156.    This claim is pleaded in the alternative to the breach of implied contractual duty claim.

157.    Plaintiffs and members of the Class conferred a monetary benefit upon Defendant in the form of monies paid for treatment services.

158.    Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiffs and members of the Class. Defendant also benefited from the receipt of Plaintiffs' and members of the Class's PHI, as this was used to facilitate payment and treatment services.

159.    As a result of Defendant's conduct, Plaintiffs and members of the Class suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiffs and members of the Class paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

160.    Under principals of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and members of the Class because Defendant failed to implement (or adequately implement) the data privacy and security

practices and procedures for itself that Plaintiffs and members of the Class paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

161.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and members of the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

**FIFTH CAUSE OF ACTION**
**Arizona Consumer Fraud Act,**
**A.R.S. §§ 44-1521, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

162.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 93.

163.    Defendant sold Plaintiffs and Class members "merchandise" as that term is defined by A.R.S. § 44-1521, in the form of services, including healthcare and insurance services, as well as the sale of objects, wares, goods, and commodities at outlets where Defendant accepted payment cards in point-of-sale transactions.

164.    Section 44-1522 of the Arizona Consumer Fraud Act provides:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby.

*See* A.R.S. § 44-1522(A).

165.    Defendant used deception, used a deceptive act or practice, and fraudulently omitted and concealed material facts in connection with the sale or advertisement of that merchandise in violation of A.R.S. § 44-1522(A).

166.    Defendant omitted and concealed material facts, which it knew about and had the duty to disclose—namely, Defendant's inadequate privacy and security protections for Plaintiffs' and Class members' PHI. Defendant omitted and concealed those material

facts even though in equity and good conscience those facts should have been disclosed and did so with the intent that others would rely on the omission, suppression, and concealment.

167.    The concealed facts are material in that they are logically related to the transactions at issue and rationally significant to the parties in view of the nature and circumstances of those transactions.

168.    Plaintiffs do not allege any claims based on any affirmative misrepresentations by Defendant; rather, Plaintiffs allege that Defendant omitted, failed to disclose, and concealed material facts and information as alleged herein, despite its duty to disclose these material facts.

169.    Defendant knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Class members' PHI, and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in these deceptive acts and practices were knowing and willful, and wanton and reckless with respect to the rights of Plaintiffs and Class members.

170.    Specifically, Defendant failed to comply with the standards outlined by the FTC and HIPAA regarding protecting PHI. As a healthcare institution that has operated since 1964, Defendant was or should have been aware of these standards. Defendant's data security systems did not follow the FTC's guidelines and HIPAA's Administrative Simplification Rules and, as a result, were operating below the minimum standards set forth.

171.    Plaintiffs and Class members were ignorant of the truth and relied on the concealed facts and incurred damages as a consequent and proximate result.

172.    Plaintiffs and Class members seek all available relief under A.R.S. §§ 4421, *et seq.*, including, but not limited to, compensatory damages, punitive damages, injunctive relief, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated, request the following relief:

A.  An Order certifying this action as a class action and appointing Plaintiffs as Class representatives and the undersigned as Class counsel;

B.  A mandatory injunction directing Yuma Regional to adequately safeguard the PHI of Plaintiffs and the Class hereinafter by implementing improved security procedures and measures;

C.  A mandatory injunction requiring that Yuma Regional provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of PHI to unauthorized persons;

D.  Enjoining Yuma Regional from further deceptive practices and making untrue statements about the Data Breach and the stolen PHI;

E.  An award of damages, in an amount to be determined;

F.  An award of attorneys' fees and costs;

G.  An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law;

H.  Granting the Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.  Such other and further relief as this court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 5, 2022,                    Respectfully submitted,

/s/Elaine A. Ryan
Elaine A. Ryan (AZ Bar #012870)
Colleen M. Auer (AZ Bar#014637)
**AUER RYAN, P.C.**
20987 N. John Wayne Parkway, #B104-374
Maricopa, AZ 85139
520-705-7332
eryan@auer-ryan.com
cauer@auer-ryan.com

**TURKE & STRAUSS LLP**
Sam Strauss*
Raina Borrelli*
613 Williamson Street, #201
Madison, Wisconsin 53703
936 N.34th Street, #300
Seattle, Washington 98103
Telephone: (608) 237-1775
Facsimile: (608) 509-4423
sam@turkestrauss.com
raina@turkestrauss.com

* to seek admission *pro hac vice*

*Counsel for the Plaintiffs and the Proposed Class*

# EXHIBIT A

**Notice of Security Incident**

Yuma Regional Medical Center (YRMC) is committed to protecting the privacy and security of our patients' information. Regrettably, we recently addressed a cybersecurity incident that involved some of that information. This notice explains the incident and the measures we have taken in response:

**What Happened:** On April 25, 2022, we identified a ransomware incident affecting some internal systems. Upon detecting the incident, YRMC took immediate action, taking systems offline, communicating with law enforcement, and initiating an investigation with the help of a third-party forensic firm. The investigation determined that an unauthorized person gained access to our network between April 21, 2022, and April 25, 2022, and removed a subset of files from our systems.

**What Information was Involved:** The files contained certain patient information, including names, Social Security numbers, health insurance information and limited medical information relating to care as a YRMC patient. Our electronic medical record application was not accessed during this incident.

**What We are Doing in Response:** We want to assure our community that we are taking this matter very seriously.  To help prevent something like this from happening again, we strengthened the security of our systems and will continue enhancing our protocols to safeguard the information in our care.

We are mailing letters to affected patients and offering free credit monitoring and identify theft protection services to those who are eligible. If you believe you are affected and do not receive a letter by July 10, 2022, please contact our dedicated external call center at (855) 503-3409, Monday through Friday, 6:00 a.m. to 3:30 p.m., Pacific Time.

# EXHIBIT B

**YUMA REGIONAL MEDICAL CENTER**

English

Search

Search

Go

I WANT TO

I Want to

HOME (/) / ABOUT US (/ABOUT-US) / **NOTICE OF PRIVACY PRACTICES**

A A A

## Notice of Privacy Practices

NOTICE OF PRIVACY PRACTICES
YUMA REGIONAL MEDICAL CENTER 928-344-2000

THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED
AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATON.
PLEASE REVIEW IT CAREFULLY.

We are committed to protecting the confidentiality of your medical information, and are required by law to do so. This notice describes how we may use your medical information within the Hospital and the other businesses owned by Yuma Regional Medical Center (YRMC), and how we may disclose your medical information to others. This notice also describes the rights you have concerning your own medical information. Please review it carefully and let us know if you have questions.

**HOW WILL WE USE AND DISCLOSE YOUR MEDICAL INFORMATION?**

**Treatment:** We may use your medical information to provide you with medical services and supplies. We may also disclose your medical information to others who need that information to treat you, such as doctors,  physician assistants, nurses, medical and nursing students, technicians, therapists, emergency service and medical transportation providers, medical equipment providers, and others involved in your care. For example, we will allow your physician to have access to your Hospital or other medical records to assist in your treatment at the Hospital or other YRMC businesses and for follow-up care.

**Appointments:** We also may use and disclose your medical information to contact you to remind you of an upcoming appointment, to inform you about possible treatment options or alternatives, or to tell you about health-related services available to you.

**Patient Directory:** In order to assist family members and other visitors in locating you while you are in the Hospital, YRMC maintains a patient directory. This directory may include your name, room number, your general condition (such as fair, stable, or critical), and your religious affiliation (if any). We will disclose this information to someone who asks for you by name, although we will disclose your religious affiliation only to clergy members. If you do not want to be included in the Hospital's patient directory, please inform the Hospital's registration personnel, Privacy Official or inform nursing personnel that you want your name removed from the Hospital's patient directory.

**Family Members and Others Involved in Your Care:** We may disclose your medical information to a family member or friend who is involved in your medical care, or to someone who helps to pay for your care. We also may disclose your medical information to disaster relief organizations to help locate a family member or friend in a disaster. If you do not want the Hospital or other YRMC businesses to disclose your medical information to family members or others who will visit you, please inform registration personnel, nursing personnel or the management at other YRMC businesses that you do not want the Hospital or the other business to disclose your medical information to family members or others. You have the right to request a restriction on our disclosure of your PHI to someone who is involved in your care.

**Payment:** We may use and disclose your medical information to get paid for the medical services and supplies we provide to you. We may tell your health insurer about a treatment your doctor has recommended to obtain prior approval to determine whether your plan will cover the cost of the treatment. For example, your health plan or health insurance company may ask to see parts of your medical record before they will pay us for your treatment.

**Hospital Operations:** We may use and disclose your medical information if it is necessary to improve the quality of care we provide to patients or to run the Hospital and other YRMC businesses. We may use your medical information to conduct quality improvement activities, to obtain audit, accounting or legal services, or to conduct business management and planning. For example, we may look at your medical record to evaluate whether Hospital personnel, your doctors, or other health care professionals did a good job.

**Business Associates:** We may use and disclose your PHI to others that assist us in operating our businesses. They may perform various services for us. These outside

**About Us** (/About-Us)

Leadership (/About-Us/Leadership)

Our History (/About-Us/Our-History)

Show more ()

companies are called "business associates". They contract with us to keep any PHI received from us confidential in the same way we do. These companies may create or receive PHI on our behalf.

**Fundraising Activities:** Many of our patients like to make contributions to the Hospital. We may use certain information (name, address, phone number, email information, age, date of birth, gender, health insurance status, dates of service, department of service information, treating physician information or outcome information) to contact you for the purpose of raising money for YRMC and you will have the right to opt out of receiving such communications with each solicitation. For the same purpose, we may provide your name to our institutionally related foundation. The money raised will be used to expand and improve the services and programs we provide the community. If you do not want the Hospital or its foundation to contact you for fundraising and you wish to opt out of these contacts, or if you wish to opt back in to their contacts, you must call or email the Yuma Regional Medical Center Foundation at 928-336-7045 or email foundationemail@yumaregional.org (mailto:foundationemail@yumaregional.org). You are free to opt out of fundraising solicitation, and your decision will  have no impact on your treatment or payment for services at YRMC and other YRMC businesses.

**Shared Medical Record/Health Information Exchanges:** We maintain PHI about our patients in shared electronic medical records that allow the Hospital and other YRMC businesses to share PHI. We may also participate in various electronic health information exchanges that facilitate access to PHI by other health care providers who provide you care. For example, if you are admitted on an emergency basis to another hospital that participates in the health information exchange, the exchange will allow us to make our PHI available electronically to those who need it to treat you.

**Research:** We may use or disclose your medical information for research projects, such as studying the effectiveness of a treatment you received. These research projects must go through a special process that protects the confidentiality of your medical information. In some instances, the law allows us to do some research using your PHI without your approval.

**Required by Law:** Federal, state, or local laws sometimes require us to disclose patients' medical information. For instance, we are required to report child abuse or neglect and must provide certain information to law enforcement officials in domestic violence cases. We also are required to give information to the Arizona Workers' Compensation Program for work-related injuries.

**Public Health:** We may report certain medical information for public health purposes when required or permitted to do so by federal, state, or local law. For instance, we are required to report births, deaths, and communicable diseases to the State of Arizona. We may need to report patient problems with medications or medical products to the FDA, or may notify patients of recalls of products they are using.

**Public Safety:** We may disclose medical information for public safety purposes in limited circumstances. We may disclose medical information to law enforcement officials in response to a search warrant or a grand jury subpoena. We also may disclose medical information to assist law enforcement officials in identifying or locating a person, to prosecute a crime of violence, to report deaths that may have resulted from criminal conduct, and to report criminal conduct at the Hospital. We may disclose your medical information to law enforcement officials and others to prevent a serious threat to health or safety.

**Health Oversight Activities:** We may disclose medical information to a government agency that oversees the Hospital or its personnel, such as the Arizona Department of Health Services, the federal agencies that oversee Medicare, the Board of Medical Examiners or the Board  of Nursing.  These agencies need  medical information to monitor the Hospital's and other YRMC businesses' compliance with state and federal laws.

**Coroners, Medical Examiners and Funeral Directors:** We may disclose medical information concerning deceased patients to coroners, medical examiners and funeral directors to assist them in carrying out their duties.

**Organ and Tissue Donation:** We may disclose medical information to organizations that handle organ, eye or tissue donation or transplantation.

**Military, Veterans, National Security and Other Government Purposes:** If you are a member of the armed forces, we may release your medical information as required by military command authorities or to the Department of Veterans Affairs. The  Hospital  and other YRMC  businesses may also  disclose medical information  to federal officials  for intelligence and national security purposes or for presidential Protective Services, as appropriate.

**Judicial Proceedings:** The Hospital and other YRMC businesses may disclose medical information if we are ordered to do so by a court or if the Hospital or other YRMC

businesses receives a subpoena or a search warrant. You will receive advance notice about this disclosure in most situations so that you will have a chance to object to sharing your medical information.

**Information with Additional Protection:** Certain types of medical information have additional protection under state or federal law. For instance, medical information about communicable disease and HIV/AIDS, drug and alcohol abuse treatment, genetic testing, and evaluation and treatment for a serious mental illness is treated differently than other types of medical information. For those types of information, the Hospital is required to get your permission before disclosing that information to others in many circumstances.

**Mobile Application:** The Hospital's mobile applications for patients, including Yuma Regional MyCare (Epic's MyChart) for iOS and Android, are intended to connect to servers and systems operated and maintained by The Hospital in order to provide you secure, mobile access to those systems and to your health information.  The Hospital does not sell or license any information that you may provide to us as you use our Applications. The Hospital attempts to minimize the amount of your personal or health information stored or retained on your device. Nevertheless, our Application may: Store a copy of a picture on your device if you choose to add a picture to your profile; Create encrypted identifiers to identify target healthcare providers for HealthKit or Google Fit data, if you are using HealthKit or Google Fit; Temporarily store your personal information in memory or on the device while you use our Applications; In addition, in order to provide you certain features, our Applications may request information from The Hospital servers and systems and those servers and systems may record technical information about that request such as an IP address and information related to the type of device, platform, and operating system you use with our Applications. Except for those things stated above, our Applications do not send your personal information directly to The Hospital and do not store any of your personal information on your device or in the cloud-based storage solution associated with your device (i.e.,iCloud or its equivalent). You understand that while connected or attempting to connect to The Hospital's system, The Hospital may collect, store, process, maintain, upload, sync, transmit, share, disclose, and use certain data and related information, including information or data regarding the characteristics or usage of your device, system and application software, and peripherals as well as your personal information, location data and other content. With your permission, certain versions of our Applications can connect to Apple HealthKit or Google Fit to receive health information and to share that information with your healthcare providers. Our Applications do not share your health information with HealthKit, Google Fit, or other software enabled with HealthKit or Google Fit. The security of your information and data while using our Applications is very important to us. Our Applications employ a variety of technical safeguards to protect the confidentiality, integrity, and availability of your personal information including supporting Transport Layer Security (TLS)/Secure Sockets Layer (SSL) certificate technology and encryption.

**Other Uses and Disclosures:** If the Hospital or the other YRMC businesses wish to use or disclose your medical information for a purpose that is not discussed in this Notice, we will seek your permission. If you give your permission to us, you may take back that permission any time, unless we have already relied on your permission to use or disclose the information. If you would ever like to revoke your permission, please notify **Yuma Regional Medical Center, Attention: Health Information Management Department at the Hospital or other YRMC business at the address at the top of this Notice.**

**WHAT ARE YOUR RIGHTS?**

**Right to Request Your Medical Information:** You have the right to look at your own medical information and to get a copy of that information. (The law requires us to keep the original record.) This includes your medical record, your billing record, and other records we use to make decisions about your care. To request your medical information, write to **Yuma Regional Medical Center, Attention: Health Information Management Department at the Hospital or other YRMC business at the address on the top of this Notice.** If you request a copy of your information, you will be requested to complete an authorization and we may charge you for our costs to copy the information. We will tell you in advance what this copying will cost. You can look at your record at no cost.

**Right to Request Amendment of Medical Information You Believe Is Erroneous or Incomplete:** If you examine your medical information and believe that some of the information is wrong or incomplete, you may ask us to amend your record. To ask us to amend your medical information, write to **Yuma Regional Medical Center, Attention: Health Information Management Department at the Hospital or other YRMC business at the address on the top of this Notice.**

**Right to Get a List of Certain Disclosures of Your Medical Information:** You have the right to request a list of many of the disclosures we make of your medical information. If you would like to receive such a list, write to **Yuma Regional Medical Center, Attention: Health Information Management Department at the Hospital or other YRMC business at the address on the top of this Notice.** We will provide the first list to you free, but we may charge you for any additional lists

you request during the same year. We will tell you in advance what this list will cost.

**Right to Request Restrictions on How the Hospital or other YRMC Businesses Will Use or Disclose Your Medical Information for Treatment, Payment, or Health Care Operations:** You have the right to ask us not to make uses or disclosures of your medical information to treat you, to seek payment for care, or to operate the Hospital. We are not required to agree to your request, but if we do agree, we will comply with that agreement. We will agree to restrict disclosure of PHI about an individual to a health plan if the PHI pertains solely to a service for which the individual, or a person other than the health plan, has paid YRMC or other YRMC businesses in full. For example, if a patient pays for a service completely out of pocket and asks us not to tell his/her insurance company , we will abide by this request. If you want to request a restriction, write to **Yuma Regional Medical Center, Attention: Health Information Management Department at the Hospital or other YRMC business at the address on the top of this Notice.** Please describe your request in detail.

**Right to Request Confidential Communications:** You have the right to ask us to communicate with you in a way that you feel is more confidential. You may request not to be contacted on your cell phone and or home phone using prerecorded messages, artificial voice messages, automatic telephone dialing devices or other computer assisted technology, or by electronic mail, text messaging or by any other form of electronic communication. To do this, contact **Yuma Regional Medical Center Privacy Official at 928-336-7600 or email PrivacyOfficial@yumaregional.org (mailto:PrivacyOfficial@yumaregional.org)** You can also ask to speak with your health care providers in private outside the presence of other patients—just ask them!

**Right to be Notified of a Breach:** You have the right to be notified in the event that we or one of our Business Associates discovers a breach of unsecured PHI.

**Right to Copy:** If you have received this notice electronically, you have the right to a paper copy at any time. You may download a paper copy of the notice from our Web site, at www.yumaregional.org (https://www.yumaregional.org) , or you may obtain a paper copy of the notice by visiting any of our **Yuma Regional Medical Center Information Desks or Patient Registration areas, going to our Health Information Management Department or requesting a copy by writing to Yuma Regional Medical Center, Attention: Privacy Official, at 2400 South Avenue A Yuma, Az. 85364.**

MyCare is a safe, secure, online health management tool that connects YRMC patients to portions of their personalized health information. An activation code will be provided at the end of your hospital stay. You may also contact the Health Information Management Release of Information Desk to request an activation code or visit us online at www.yumaregional.org (https://www.yumaregional.org) . Select YRMCCare for directions.

## CHANGES TO THIS NOTICE

From time to time, we may change our practices concerning how we use or disclose patient medical information, or how we will implement patient rights concerning their information. We will publish a revised Notice of Privacy Practices. You can get a copy of our current notice of Privacy Practices at any time by visiting our Web site, at www.yumaregional.org (https://www.yumaregional.org) or you may obtain a paper copy of the notice by visiting any of our Yuma Regional Medical Center Information Desks or Patient Registration areas.

## WHICH HEALTH CARE PROVIDERS ARE COVERED BY THIS NOTICE?

This Notice of Privacy Practices applies to the Hospital and the other YRMC Businesses listed at the top of this Notice, and all YRMC personnel, volunteers, students, and trainees. The Notice also applies to other health care providers that come to the Hospital and other YRMC businesses to care for patients (such as physicians, physician assistants, medical residents, therapists, emergency service providers, medical transportation companies, medical equipment suppliers, and other health care providers not employed by YRMC), unless these other health care providers give you their own Notice that describes how they will protect your medical information. The Hospital may share your medical information with these providers for their treatment, payment, and health care operations. This arrangement is only for purposes of sharing information.

## DO YOU HAVE CONCERNS OR COMPLAINTS?

Please tell us about any problems or concerns you have with your privacy rights or how the Hospital uses or discloses your medical information. If you have a concern, please contact the Privacy Official at Yuma Regional Medical Center. If for some reason the Hospital cannot resolve your concern, you may also file a complaint with the federal government. We will not penalize you or retaliate against you in any way for filing a complaint with the federal government.

## DO YOU HAVE QUESTIONS?

The Hospital is required by law to give you this Notice and to follow the terms of the Notice that is currently in effect. If you have any questions about this Notice, or have further questions about how the Hospital may use and disclose your medical information, please contact the **Privacy Official at 928-336-7600 or email PrivacyOfficial@yumaregional.org (mailto:PrivacyOfficial@yumaregional.org).**

Version # 3
Effective date: April 14, 2003
Revised date: December 27, 2007
Revised date: March 29, 2013

(/Home)

f   y   ▶   in
(https://www.facebook.com/yumaregionalmedicalcenter/company/yuma-
lang=en)           regional-
                   medical-
                   center)

**CONTACT DIRECTORY**

2400 S. Avenue A
Yuma, AZ 85364

**GENERAL INFORMATION**

928-344-2000
(tel:9283442000)

**FIND A PHYSICIAN**

928-336-2273
(tel:9283362273)

**EXPLORE**

For Patients (/For-Patients)

For Visitors (/For-Visitors)

Medical Services (/Medical-Services)

About Us (/About-Us)

For the Community (/For-The-Community)

Careers (/Careers)

**I WANT TO**

Find a Physician (/For-Patients/Find-a-Physician)

Pay My Bill (/For-Patients/Patient-Portal/Pay-Bill)

Access MyCare Patient Portal (/For-Patients/Patient-Portal)

Get Maps & Directions (/About-Us/Our-Locations)

Access Phone Directory (/About-Us/Contact-Us)

Donate to the Foundation of YRMC (/For-The-Community/Foundation)

**FOR EMPLOYEES**

Access Employee Portal (/Careers/Employee-Portal)

Access Board Portal (https://boardvantage.nasdaq.com/)

Access Provider Portal (/Provider-Portal)

Notice of Privacy Practices (/EmergeWebsite/media/Yuma-Documents/NoticePrivacyPracticesEnglish.pdf)   |   Access Employee Portal (/Careers/Employee-Portal)   |   Site Map (/Sitemap)   |   Fast Command (http://yrmc.fastcommand.com/)   |

Awards & Accolades

 (https://www.dnvglhealthcare.com/)    (https://www.swae.org/)    (/EmergeWebsite/media/Yuma-Images/About%20Us/Most-Wired-2017.png)    (https://www.facs.org/quality-programs/mbsaqip)

Yuma Regional Medical Center **|** Contact No. **–** 928-344-2000 (tel:9283442000)
©2022 Copyright . Yuma Regional Medical Center **–** All Rights Reserved.

# EXHIBIT C



OUR LOCATIONS (/ABOUT-US/OUR-LOCATIONS)

FIND A PHYSICIAN (/FOR-PATIENTS/FIND-A-PHYSICIAN)

DONATE (/ABOUT-US/CONTACT-US)     CONTACT US (/ABOUT-US/CONTACT-US)

YUMA REGIONAL MEDICAL CENTER

English

Search

Search
Go

I WANT TO

I Want to

HOME (/) / FOR PATIENTS (/FOR-PATIENTS) / YOUR HOSPITAL STAY (/FOR-PATIENTS/YOUR-HOSPITAL-STAY) / **PATIENT RIGHTS AND RESPONSIBILITIES**

A A A  🖨  🔗

# Patient Rights and Responsibilities

We are honored to partner with you in your care. As a patient at Yuma Regional Medical Center, you have many rights, including the right to:

❯ Not to be denied participation in all treatment services based on the grounds of race, color, creed, gender, sexual, orientation, national origin, disability, diagnosis, religion, or socio-economic status.

❯ Considerate and respectful care.

❯ Reasonable privacy. Your doctor and others caring for you will protect your privacy appropriately.

❯ Receive visitors, communicate by telephone or mail. If any restrictions are placed on communication, you should receive a full explanation.

❯ Have a family member, representative or physician of your choice notified promptly of your admission.

❯ Be well informed about your illness and treatment options by discussing this information with your doctor.

❯ Assessment and management of pain. Information about pain and pain relief shall be shared. Staff members are committed to pain prevention and management.

❯ Know the names and roles of people treating you.

❯ To participate in development and implementation of your plan of care, make decisions regarding your care and be informed of your status.

❯ Consent to or refuse treatment, as permitted by law, throughout your stay. If you refuse a recommended treatment, you will receive other needed and available care.

❯ Designate a surrogate decision maker with the same rights of treatment participation as yourself for medical emergencies.

❯ Consent to photographs of the patient before the patient is photographed, except for identification purposes or documentation or care such as wounds.

❯ Be informed except in an emergency, of alternatives to a proposed psychotropic medication or surgical procedure and associated risks and possible complications.

❯ Have an advance directive (Living Will, or Healthcare Proxy, Durable Power of Attorney for Healthcare, or DNR order or identification). These documents express your choices about your future care or name someone to decide if you cannot speak for yourself. A copy should be provided to YRMC, your family, and your doctor. YRMC staff and practitioner will comply with these directives.

❯ Expect reasonable access to care and services. Referral or transfer may be recommended if you are medically stable. You will be informed of risks,  benefits, and alternatives by your doctor. You will not be transferred until the other institution agrees to accept you. Patients requesting transfer to another facility may be at your expense.

❯ Access information in your medical records and to have the information explained, except when restricted by law.

❯ Recognize the effect of life-style on your personal health. Your health depends not just on your hospital care, but in the long term, on the decisions you make in your daily life.

❯ Expect that treatment records are confidential unless you have given permission to release information or reporting is required or permitted by law.

❯ Know if this hospital has relationships with outside parties as applicable to your treatment and care.

❯ Be told of realistic care alternatives when hospital care is no longer appropriate.

❯ Consent or decline to take part in research or other experimentation affecting your care. If you choose not to take part, you will receive appropriate care.

❯ A second opinion or specialist consultation regarding your treatment at your expense. This includes the right to request a change in attending physicians.

❯ Know about hospital rules that affect you and your treatment and about charges and payment methods. This includes obtaining a schedule of rates and charges.

❯ To know about resources, such as patient representatives or Patient Care Advocates, that can help you resolve problems and questions about your hospital

**Your Hospital Stay (/For-Patients/Your-Hospital-Stay)**

Patient Rights and Responsibilities (/For-Patients/Your-Hospital-Stay/Patient-Rights-and-Responsibilities)

Outpatient Observation Care (/For-Patients/Your-Hospital-Stay/Outpatient-Observation-Care)

Show more ()  ❯

stay and care.

❯ To receive care in a safe setting, free from abuse, neglect, exploitation, manipulation, sexual abuse or harassment, and to be free from restraints and seclusion used as a means of coercion, discipline, convenience, or retaliation by staff that includes misappropriation of personal and private property.

❯ To have your rights explained in a language you understand. A request for appropriate language assistance (/For-Patients/Patient-Resources/Language-Services) when you have Limited English Proficiency (LEP) or have a disability will be provided to the patient free of charge.

❯ To file a complaint related to your care stay at this facility. To file a complaint contact: Care Advocacy at **928-336-2002** (tel:9283362002) or **928-336-2357 (tel:9283362357).**

❯ To report unresolved concerns with YRMC facilities contact:

Arizona Department of Health Services
Division of Licensing Services
150 North 18th Avenue, Suite 450
Phoenix, Arizona 85007
**602-364-3030 (tel:6023643030)** or **1-800-221-9968 (tel:18002219968)**

Quality care also requires also a close partnership between you and your care team. As a patient at Yuma Regional Medical Center you are responsible to:

❯ Provide information about your health, including past illness, hospital stays, and use of medicine and non-prescribed treatments.

❯ Tell your doctor when you believe you can't follow through with your treatment.

❯ Be considerate of the needs of other patients, staff, and the hospital by following YRMC rules and regulations concerning patient care and conduct.

❯ Provide information for insurance and for promptly meeting any financial obligations.

If you have any questions about your rights and responsibilities as a patient at Yuma Regional Medical Center, please feel to call our Patient Advocate Office at **928-336-2002 (tel:9283362002).**

(/Home)

f  t  y  in

(https://www.facebook.com/yumaregionalmedicalcenter) (https://twitter.com/yrmchealthcare?lang=en) (https://www.youtube.com/user/yumaregional) (https://www.linkedin.com/company/yuma-regional-medical-center)

**CONTACT DIRECTORY**
2400 S. Avenue A
Yuma, AZ 85364

**GENERAL INFORMATION**
928-344-2000 (tel:9283442000)

**FIND A PHYSICIAN**
928-336-2273 (tel:9283362273)

**EXPLORE**
For Patients (/For-Patients)
For Visitors (/For-Visitors)
Medical Services (/Medical-Services)
About Us (/About-Us)
For the Community (/For-The-Community)
Careers (/Careers)

**I WANT TO**
Find a Physician (/For-Patients/Find-a-Physician)
Pay My Bill (/For-Patients/Patient-Portal/Pay-My-Bill)
Access MyCare Patient Portal (/For-Patients/Patient-Portal)
Get Maps & Directions (/About-Us/Our-Locations)
Access Phone Directory (/About-Us/Contact-Us)
Donate to the Foundation of YRMC (/For-The-Community/Foundation)

**FOR EMPLOYEES**
Access Employee Portal (/Careers/Employee-Portal)
Access Board Portal (https://boardvantage.nasdaq.com/)
Access Provider Portal (/Provider-Portal)

Notice of Privacy Practices (/EmergeWebsite/media/Yuma-Documents/NoticePrivacyPracticesEnglish.pdf) | Access Employee Portal (/Careers/Employee-Portal) | Site Map (/Sitemap) | Fast Command (http://yrmc.fastcommand.com/)

Awards & Accolades

 (https://www.dnvglhealthcare.com/)

 (https://www.swae.org/)

 (/EmergeWebsite/media/Yuma-

Images/About%20Us/Most-Wired-2017.png)  (https://www.facs.org/quality-programs/mbsaqip)

Yuma Regional Medical Center **|** Contact No. **-** 928-344-2000 (tel:9283442000)

©2022 Copyright . Yuma Regional Medical Center **-** All Rights Reserved.